Thank you, Your Honors. May it please the Court, my name is Hank Baltzan, and I'm here on behalf of Sean Francis, the appellant. I'd like to set aside two minutes for rebuttal, please. All right. I'll also watch the clock. Your Honors, this is a quintessential case of prison officials acting with deliberate indifference to a prisoner's serious medical needs. A quintessential case would be prisoner complains of medical ailment and the correctional staff does nothing. I would not call this a quintessential case. I mean, this guy was seen by physicians over a course of several years, probably more times than many of us see a doctor in our lifetime. So, I mean, isn't this really kind of a misdiagnosis case or almost a malpractice claim as opposed to indifference? It's not, Your Honor. And it is true that Mr. Francis was seen on multiple occasion and occasions, and he did receive treatment. He received recommendations for icing his shoulder, anti-inflammatories, rest, those sorts of things. But for a shoulder injury, there's a continuum of care. And, yes, it starts with conservative treatment. You rest it, you ice it, you take anti-inflammatories, you see if it gets better. And if it doesn't, then there are additional steps that can be taken to see what's causing the shoulder injury and to treat it. But the problem for your client is that when he finally got the outside referral to the orthopod at UW, nothing changed in the treatment plan. He didn't get surgery. I mean, basically, the doctor confirmed what the DOC doctors had been saying. So I'm really having a difficult time understanding where the harm is here to support an Eighth Amendment deliberate indifference claim. Your Honor, when Mr. Francis saw the orthopedist at UW after the preliminary injunction was granted, the reason that nothing further was prescribed is because before he saw the orthopedist, he saw a sports medicine doctor at UW that was – it sort of happened a little bit accidentally. Right. We know that part of the record. And he got the cortisone injection. But he doesn't – he had been offered an injection before, and there's some mixed testimony. He said, well, I didn't really turn it down. I wanted more information. But he had that offered to him, right, even before he took that injection and before the xylocaine. He had had steroid offered to him, correct? That's correct. He had it offered to him. And then ultimately they say there's no atrophy, no tear, really no surgically appropriate treatment at that time. So kind of echoing Judge Talman, what are you left with? Where is the deliberate indifference? Because, yes, he was offered a steroid injection, which seems to be an acknowledgment that he needs something else than what he's been given to address the pain. The doctor who offered it says Mr. Francis refused. There's a dispute. So on summary judgment, the fact should be viewed in Mr. Francis's favor. But even if the court were to accept – He doesn't deny that he was offered it, does he? He just denies that he flat-out denied or refused it. I just want to make sure that we're talking on the same page. He wanted more information, right, before deciding. But he was offered the steroid injection. He was offered. So they're ratcheting up. We've got the ibuprofen, the icing, and up, up, up. Now we've got the steroid injection. And what's after that? So after that, when Mr. Francis sees in his chart that Dr. Kenny had interpreted their conversation as him refusing the steroid injection, he sent two written kites saying, no, I'm not refusing it. I wanted more information. Yes, I would like to try that. And even after that, when his counsel sent a letter to Dr. Hammond and Dr. Warner and Dr. Smith, counsel reiterated, yes, he would like to try the steroid injection, but it never happened. It never happened until after the district court issued a preliminary injunction requiring DOC to send him out. How much time? What was that interval? How much time went by? From between the time that it was offered or between the time of the letter? Between the time it was offered and the time he got the injunction. So Dr. Kenny saw him in September 2012, September 24, 2012. Okay. And he got the injection in July 2013. Okay. So is your ‑‑ I'll just be frank. It strikes me that the amount of treatment here just doesn't calibrate against our other case law as amounting to deliberate indifference. So when I look at cases where we have found or upheld deliberate indifference, it strikes me that the facts have just been a lot more egregious, where someone is waiting for months and months and months on end without any treatment, where somebody is really ignoring. I mean, deliberate indifference, of course, is a term of art, and it's really an extreme level. And so what's your best shot that the conduct here amounts to deliberate indifference? Well, Your Honor, the offering of a steroid injection didn't come until roughly two years when his providers were starting to recommend an orthopedic referral. So for all that time, the conservative treatment had plainly failed. His treating providers had requested ‑‑ Can I stop you there? Sure. I think that's really key, to say his conservative treatment had failed. It's not that he wasn't getting treatment. It's that it wasn't working out for him. Right. And just because it wasn't working out for him doesn't mean that they're deliberately indifferent. It means that they're not hitting the mark. You know, they tried X and it didn't work. Maybe they tried Y and it didn't work and so forth. But that is qualitatively different. Which is why I asked you whether this is really almost a medical malpractice or a mistreatment claim, that they should have offered him different treatment than what he got. Is that the basis of the deliberate indifference? Well, yes, they should have offered something much sooner because conservative treatment can't go on indefinitely. Under the standard of care, we had an expert that testified, after three to six months of trying conservative treatment, after that shows to be unsuccessful, you go to the next step. But he suffers from arthritis, does he not? This is from a shoulder injury that he suffered while lifting weights at the prison. Right. So he essentially has a chronic disease that is not going to cure itself, and there is no cure for it. So the question is how you address the pain or the symptoms that flow from a chronic disease and a diagnosis of arthritis in a joint. Right. Isn't that the case that we have? Yes, Your Honor. So how does that fit into our deliberate indifference cases where all the doctors agreed, for example, in the Nevada case, that the guy needed eye surgery, but the Department of Corrections steadfastly refused to provide him because one good eye was enough? That's not what we have here. Well, to some extent we do because Dr. Kenney had said that he could do his activities of daily living with his left arm, but his right arm was limited, and it was at that point that he offered the steroid injection. But, again, it didn't happen. Did he justify that he couldn't use his right arm at all? That was not how I read the record. No, but it was limited. There was a restriction on what he could lift. I want to move to a different topic because we've got only two minutes left. I want to ask you about the box lifting of your legal materials. Do we have on the record how much the legal materials weighed? That's not in the record. Okay. So his claim, as I understand it, and you can correct me if I'm wrong, is basically that he got these orders, move that box or move your materials off of the floor. Is that right? And he did it. Because he didn't want to get sanctioned. It was to lift the box up into your cubicle. Right. And so is there anything about his effort, there was some suggestion, well, you know, you don't have to lift the whole box. You can move part by part. Is there anything suggesting that he tried to do that? He did that after the sergeant, after he had already injured his shoulder, and the sergeant told him to move the materials that way. But before he tried to lift the box, the officers were just telling him to lift the box. Did they tell him to lift the box or to get it off the floor? To get it off the floor, to put the box up in the cubicle. I mean, we're getting into semantics. They knew that he was concerned about his shoulder injury. It's not semantics. It's a question of whether or not he has any obligation to protect himself from injury. I mean, you don't have to be a rocket scientist to figure out that if the box is too heavy to lift, then you lift out the material in pieces and move it in the cubicle piece by piece. I mean, does the Eighth Amendment say that a correctional officer has to tell him how to do that? Your Honor, viewing the facts in Mr. Francis's favor. I am viewing them. Okay. I am viewing them in the facts most favorable to Mr. Francis, and I'm really having a tough time here seeing how the Eighth Amendment, which forbids cruel and unusual punishment, has been violated here. The officers told him to put the box in the cubicle. If they didn't see the option, they were aware that Mr. Francis was concerned about his shoulder injury and lifting the box. If in response to that, if they didn't see the option to, well, take pieces out. I mean, this was legal material, so he's concerned about their confidentiality. If they didn't see the option of taking things out and putting them on the shelf individually. And how far is the cubicle from the box? It's, well, the box is on the floor and the cubicle is over this way. So it's not like he has to go somewhere else. It's right there. I guess what you're saying is that they should have been smarter than he was about how to lift the box because they should have told him to take them out piece by piece. At least, I mean, certainly at least as smart. So they breached a duty of care to him, which sounds to me like a classic negligence claim, but not a Section 1983 violation. You have a negligence claim, don't you? We have a negligence claim. We also have an ADA claim, which also were both dismissed. But if they were aware of this option of taking things out and they didn't tell him, that's even further evidence of their deliberate indifference. Isn't it just common sense? I mean, this is really not a tough – if the object is to move the box and its contents from the floor to the cubicle, there are two ways to do it. You can try and lift the whole box or you can do it in pieces. Yes, Your Honor. But I wouldn't say it's common sense when the sergeant who reviewed the infraction sent a notice to all the staff that he has permission to leave the box on the floor. So Mr. Francis, in his mind, he is aware that staff have been informed that he has permission to leave the box on the floor. And this is a box full of legal materials. And so – How does him being – forgive me for interrupting, but you did mention it. How does him being aware that they're aware of his weight restriction change the analysis? Because he is aware that a sergeant has found that he has this restriction and the sergeant has notified staff that he's allowed to keep the box on his floor. Right. He's concerned that if he – if he even thought of it at all, he's concerned that these are confidential legal materials and if he stores them loosely on the shelf, they're not marked when officers come in to do a cell inspection or his cellmate is in the room, that they're much less confidential when they're available to view. He testified in his deposition – I think you're over time, but I'll just be quick to ask my last question. He testified in his deposition that other inmates had used file folders to maintain confidentiality but keep the stuff on the shelf or up in the cubicle. But I don't think he requested that. Is that right? I believe that's right, that he didn't request file folders. Thank you. Thank you. Morning. May it please the Court. Today we're here to ask that the decision of the district court dismissing Mr. Francis's claims be affirmed. Your Honors, under this Court's decision in Shields v. Kunkel and Jackson v. McIntosh, Mr. Francis cannot show that the defendant's decisions were medically unacceptable in light of the examination findings. They also cannot show that their treatment decisions were in conscious disregard of excessive risk to Mr. Francis's health. Is it your position that he didn't have a serious medical condition? Yes. The shoulder's not serious? Is that your position? It was not a serious medical condition to warrant the need for an outside referral. And the importance of that is if you look over the 31 months that he had examinations performed, and if you look at all the factors that were taken into account by each individual that did those examinations, they all looked at the same criteria. And they even looked at the exact same criteria that was used by the University of Washington's orthopedist in making a determination as to whether or not he even needed an orthopedic referral or whether or not any additional treatment was necessary. So from the very start, from the very beginning of examinations, they looked to see whether there was any muscle atrophy, whether there was full elevation, whether his shoulders were asymmetrical. They looked at all of that. The physician's assistant looked at that. The care review committee looked at that. Dr. Kinney looked at that. Dr. Sawyer looked at that. And they all came to the exact same conclusion that there was no objective medical findings to support any of the subjective complaints of pain that Mr. Francis was making. Well, but at one point there was a suggestion that there should be a referral, that he should see an orthopod, right? There came a suggestion from possibly the physical therapist after he participated in physical therapy that said possibly that an orthopedic referral should be done. Right. Because it wasn't working. He still said he had pain. It wasn't working. The fundamental issue, though, with Mr. Francis's motion for summary judgment and what he wants this Court to assume is that when Ms. Dotson made the referrals to the care review committee was that Ms. Dotson somehow actually supported and believed that those referrals were medically necessary. And if you look at his brief and you look at the motion for summary judgment, the only testimony, deposition testimony that he includes as part of his brief in this case is one page from Ms. Dotson's deposition that talks about how she's not the individual that authors the care review committee reports. There's no debt. Isn't your argument a whole lot stronger if you rely on what Judge Tallman is suggesting, which is that there's a difference of medical opinion here about what the next appropriate step should be taken as opposed to trying to argue that she didn't really mean it when she suggested that he should see an outside orthopod? Well, I think that both of the arguments are strong if you look at the totality of everything. So are you really asking which one are you making? Are you arguing that she didn't think he should see an outside specialist? I'm arguing that there was no physician, there was no medical provider that saw him, that thought that he needed outside medical care. And when you look at the dozen of — when you look at the dozen individuals that served on the care review committee, none of those individuals thought that his objective medical examination findings warranted an outside orthopedic referral. He did get, very early on, an outside referral, did he not? Didn't they take x-rays? And I think they might have even done an MRI. They did. Well, that was back in 2008, an MRI was performed. And after 2008, he made no complaints whatsoever of any pain. It was when he indicated in 2011, March of 2011, that he had somehow re-injured his shoulder, and that's when all the complaints of pain came back. It was at that point that the medical providers were doing examinations, and there just wasn't any objective medical evidence to support that he needed an outside referral for any type of additional care. And when you look at Dr. Kennedy from the University of Washington's examination report, he uses all the exact same criteria that all the physicians and the medical providers use when they examine Mr. Francis. So his report specifically notes and talks about how there's no atrophy, there's no gross deformity, full elevation of shoulders, his shoulders are symmetrical, and that's 31 months after the initial complaints in March of 2011. Another important thing to note is that when he goes to see Dr. Kennedy at University of Washington, that occurs only three months after he basically got this mistaken appointment with the rehab specialist. What had happened was after the court issued its order granting the preliminary injunction, the department attempted to make appointments for Mr. Francis to attend the University of Washington orthopedic clinic. What the University of Washington did was they went ahead, based on what the department provided them, they went ahead and scheduled him with a rehab specialist as opposed to an actual orthopedic clinician. That rehab specialist chose to give him a steroid injection. The important thing, though, is this, is that they have relied on that steroid injection as being the injection that basically took away his pain. But if you go back and you look at the records just three months later, when he reports to Dr. Kennedy, it's extremely important because at that appointment, three months later, he says that his pain is an 8 out of 10, and he also indicates that that pain is arching, stabbing, and sharp. So Dr. Kennedy at the University of Washington, knowing that 31 months has passed, knowing that he had already gotten the steroid injection just three months prior to that, knowing that Francis still complains that his pain is an 8 out of 10, that it's arching and stabbing, the only recommendations for treatment that Dr. Kennedy makes at that point are the exact same recommendations of treatment that he's gotten from day one in March of 2011, and that's over-the-counter pain medication and to continue strength exercise training. I think the only thing that Dr. Kennedy added was that Francis had indicated to him that the pain seemed to get worse if he was using overhand throwing. So Dr. Kennedy recommended that he quit doing that. But otherwise, Dr. Kennedy knowing after 31 months of him making the exact same complaints of pain, of the exact same objective medical findings that appeared, there was no change in the recommendation whatsoever. And I think that's important, because based on this Court's decisions in Shields v. Kunkel and Jackson v. Magentosh, he's got to show that they basically knew that their treatment decisions that they were making were in conscious disregard of an excessive risk to Mr. Francis' health, and there's just no evidence of that. Sotomayor Well, let's move to the motion of above your head and the boxes. So he has a negligence claim on that, which is, of course, quite a different standard than the Eighth Amendment. And the question is whether there are material issues of fact on that in terms of what they told him to do and what he could do with those legal materials. What is the State's position on that? Under the Washington State's Court's ruling in Cusa v. McCorkle, one of the things that the Court has indicated was that a jailer cannot be held responsible for failing to present what he cannot reasonably anticipate. And we talk about a lifting restriction here. This isn't a five-pound lifting restriction. This is 25 pounds. You can Google on any office website, and an entire box of copy paper, eight reams, is 20 pounds. So for the officers to, first, somehow believe that his legal material box contained more than 25 pounds of items in it is difficult. But, two, one of the things that Mr. Francis admitted during his deposition testimony was that he was keeping materials in there that were clearly outside of policy and things that he wasn't supposed to be keeping in there. He was working on other inmates' legal claims. He indicated that that paperwork was also contained in his box, and that his box also contained what he referred to as good reference material. It's difficult to surmise that those officers would even deem that that box would contain more than 25 pounds' worth of items in it. But, two, when they instructed him to come into compliance with cell inspections, they never said, stand here, lift that box, and put it up. They just indicated to him that he needed to get that box off the floor. And somehow, Mr. Francis wants to basically switch and shift the responsibility completely on the department and indicate that the department has to basically go in, knowing his lifting restriction, figure out how much the box weighs, and then give him specific instructions on how he needs to move that box to come into compliance. And I think that's well above the negligence standard. All right. Then I'll go ahead and take a seat. Thank you. I'll give you a minute for rebuttal. I know we went quite a bit over time, so you didn't get any saving of any time. The all of the examination findings that Ms. Dibble was referring to, most of those, the ones from Dr. Stoyer, Dr. Kenney, came more than a year after Mr. Francis's providers were recommending orthopedic referral. The argument that there were no providers who were recommending anything else be done is not true. His treating provider and his physical therapist both said, conservative treatment has failed. We recommend an orthopedic referral. Nothing happened. No steroid injections were offered. No other treatment beyond what had already failed was offered to Mr. Francis until, after counsel notified the defendants of the issue and after this lawsuit was filed. The Judge Christian, you were asking about case law and similar case law. I asked the Court to take a look at Snovey McDaniel, because even though the facts in that case, as you pointed out, were more egregious, the severity of the pain, the consequences were greater, the Eighth Amendment does not require a prisoner's level of dysfunction to be that severe before requiring prison officials to treat it. You revisited Snow and Peralta, right? We revisited Snow and Peralta en banc. Yes. So do you ‑‑ are you familiar with Peralta? And do you want to speak to how the facts here, just sort of the arc of this inmate's experience compares to Peralta? Well, Peralta overruled Snow, but on different grounds. Peralta overruled on ‑‑ with respect to ‑‑ I'm really familiar with Peralta, because I wrote part of the opinion. But ‑‑ but I'm just speaking to the notion of, you know, what Judge Tallman really started with, that this ‑‑ unlike Peralta, this inmate seems to have been seen by many care providers. He had a lot of appointments. It's not like he was ignored for months and months and months on end, is it? Right. He wasn't ignored. But many visits prescribing the same care that has failed when a treating provider is aware of something else that could be done and asks for it, but prison officials who are not the treating provider and who have not reviewed his medical records refuse to authorize that, that does demonstrate deliberate indifference. So is your position that had he been seen earlier by an outside specialist, he would have received a steroid injection sooner and that would have solved his problem? Presumably. And that was the next ‑‑ that was the next step. Well, when you say presumably, he had a three‑month steroid injection in three months. First of all, at one point he says, these didn't really work for me. That's earlier. He says, so that's why he's skeptical. Then he gets his steroid injection, three months later he's back saying, I'm in acute pain. So is there any evidence that the answer to Judge Tolman's question is yes, as opposed to speculation? Your Honor, he didn't say that ‑‑ he had not had a steroid, a therapeutic steroid injection prior to that. He had a diagnostic injection from Dr. Sawyer three months after ‑‑ Way earlier. He received oral steroids years before. Right. And those didn't help. And he said those didn't help. Right. But he got a steroid injection from the rehab specialist and then three months later he's complaining to Dr. Kennedy that it didn't work. That ‑‑ and I was looking for Dr. Kennedy's report. That's not my recollection of what he reported to Dr. Kennedy because I do recall Dr. Kennedy saying that he received a steroid injection and that that has helped him, that has alleviated his pain. But he's still telling Dr. Kennedy that his pain is 8 out of 10. So his subjective statements with regard to his symptoms don't seem to be jiving with the objective evidence here. He ‑‑ the fact remains, it is the steroid injection that alleviated his pain and that he would not have received but for this lawsuit for as long a period of time as is in the record. Well, we know that it's not more than three months, don't we? My recollection of Dr. Kennedy's report differs. Okay. Well, we can check Dr. Kennedy's report. Okay. Thank you. Thank you, Your Honor. Thank you both for your arguments this morning. The case just argued of Francis v. Hammond is submitted.
judges: McKeown, Tallman, Christen